# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT WOODEN, | ) | CASE NO. 1:16-cv-01494 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| *Acting Comm'r of Social Security*, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Robert Wooden (hereinafter "Wooden" or "Plaintiff"), challenges the final

decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter

"Commissioner"), denying his applications for a Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act"). This court has

jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

# I. Procedural History

On March 5, 2013, Plaintiff filed his applications for POD, DIB, and SSI, alleging a disability onset date of January 1, 2013. (Transcript ("Tr.") 195-207). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 134-158). Plaintiff participated in the hearing on March 9, 2015, was represented by counsel, and testified. (Tr. 29-56). A vocational expert ("VE") also participated and testified. *Id.* On April 6, 2015, the ALJ found Plaintiff not disabled. (Tr. 23). On May 3, 2016, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-3). On June 16, 2016, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 13 & 16).

Plaintiff asserts the following assignments of error: (1) the ALJ erred by not affording significant weight to the opinion of his treating physician; and (2) the ALJ erred by assigning little weight to the opinions of sources who did not qualify as acceptable medical sources. (R. 13).

# II. Evidence

## A. Personal and Vocational Evidence

Plaintiff was born in October of 1973 and was 39-years-old on the alleged disability onset date. (Tr.195). He had at least a high school education and was able to communicate in English. (Tr. 21). He had past relevant work as a kitchen supervisor and prep cook. *Id.*

**B. Relevant Medical Evidence**[1]

 **1. Treatment Records**

  **a. Records Regarding Plaintiff's Physical Health**

On January 11, 2013, Plaintiff was seen in an emergency room ("ER") for complaints of leg pain that had persisted for the past year and had worsened over the past three weeks. (Tr. 278). He was scheduled to see a Dr. Goldstein that same day regarding surgery for his varicose veins. *Id*. On January 18, 2013, an ultrasound study showed an acute, occlusive deep vein thrombosis (DVT) in Plaintiff's right leg, and varicosity in both legs. (Tr. 282-83).

On February 15, 2013, Plaintiff was seen for the first time by Carla Harwell, M.D., to establish a new primary care relationship. (Tr. 320). He complained of hip and leg pain, which had been constant since January, and rated his pain as an 8 out of 10. *Id*. Plaintiff indicated that he needed clearance for vascular surgery to address the varicose veins in his legs. *Id*. He also complained of tremors and speech difficulties, and that he walked with a cane. *Id*.

On February 20, 2013, a CT scan of Plaintiff's head revealed no evidence of acute intracranial hemorrhage or definite acute cortical infarction. (Tr. 284).

On the same day, Plaintiff was admitted to the hospital due to alcohol intoxication. (Tr. 273). Plaintiff "described recurrent episodes of nervousness, shortness of breath, difficulty walking, and stuttering that had started in January 2013." *Id*. Wooden indicated that these episodes were associated with blurred vision. He "stated that for the past 6 months, he had depressed mood, a decreased appetite, difficulty sleeping, trouble performing at work, and loss

---

[1]   The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs *and* also deemed relevant by the court to the assignments of error raised.

of interest." *Id*. ER providers determined that Plaintiff's lower extremity pain was related to venous stasis ulcers and alcoholic neuropathy. *Id*. He was started on gabapentin, which promptly resolved his leg pain. *Id*. An ophthalmologic consult revealed Plaintiff had a refractory defect and he was referred for outpatient evaluation for glasses to address his complaint of blurry vision. *Id*.

On March 1, 2013, Plaintiff was seen by Dr. Harwell, and he reported feeling better since his ER discharge and that he had not been drinking. (Tr. 409). His speech, gait, and anxiety were all improved but he still used a cane. *Id*.

On April 2, 2013, Plaintiff underwent surgery on his varicose veins performed by Jerry Goldstone, M.D. (Tr. 316-318). On April 19, 2013, Plaintiff was seen by dermatologist Ari Konheim, M.D., for a rash that was diagnosed as early psoriasis. (Tr. 329-330). A week later, Plaintiff reported gradual improvement with topical steroid therapy. (Tr. 330).

On May 1, 2013, Plaintiff was seen by Dr. Harwell. (Tr. 319). Plaintiff reported 7 of 10 pain, but was not taking any pain medications. *Id*. He believed his veins were popping out again. *Id*. She observed scattered varicosities bilaterally and lesions from psoriasis. *Id*. Plaintiff's gait was noted as steady. *Id*.

On September 25, 2013, Plaintiff was seen by Dr. Harwell for a follow-up; Wooden had "no questions or concerns as of now." (Tr. 404). He reported feeling better, not drinking alcohol since April, that his depression medication was helping, but he did complain of occasional difficulty sleeping. *Id*. He reported gaining 22 pounds since May. *Id*. There was no swelling or stiffness in his arms or legs. *Id*.

On November 27, 2013, Plaintiff was again seen by Dr. Harwell. (Tr. 403). The treatment notes are not entirely clear, however. *Id*. She appears to indicate that Plaintiff underwent a sleep

4

study, which was negative for obstructive sleep apnea, "but ? RLS [restless leg syndrome], narcolepsy." *Id*. She referred him to a sleep clinic "for ? RLS; narcolepsy" and for a colonoscopy. *Id*.

On December 16, 2013, a colonoscopy revealed diverticulosis in the ascending colon. (Tr. 427). Recommended treatment was a high fiber diet and smoking cessation. *Id*.

On February 25, 2014, Plaintiff went to the ER after a panic attack. (Tr. 444). Plaintiff reported having been recently diagnosed with restless leg syndrome and tingling in his feet and legs after long periods of sitting and standing. *Id*. On physical examination, Plaintiff was negative for leg swelling, myalgia, back pain, arthralgias, slurred speech, and visual disturbance. (Tr. 448). He has "normal [co]ordination and gait," no skin rashes, was oriented x 3, and was in no distress. *Id*.

### b. Records Regarding Plaintiff's Mental Health

On February 22, 2013, after Plaintiff was admitted to the ER for alcoholic intoxication, a psychiatric consult resulted in diagnoses of anxiety disorder and depression. (Tr. 273). It was recommended that Celexa be prescribed rather than Xanax given Plaintiff's alcohol dependence. *Id*.

On July 2, 2013, Plaintiff was evaluated at the Center for Families and Children.[2] (Tr. 351-355). Plaintiff reported psychiatric history included present symptoms of "anxiety, tactile hallucinations, talking to self, sad all the time, not like to do things, feels useless and be around anyone anymore, feeling hopeless and helpless" (Tr. 352). He also had thoughts of hurting himself a few months earlier. *Id*. He reported that, despite his symptoms, he was able to care

---

[2] It is unclear whether this report was compiled by a medical professional, as there is no identification as to who authored the report. (Tr. 351-355).

form himself, help his sisters with housework, and sometimes walk/exercise when physically able. (Tr. 354). Plaintiff was diagnosed with: (1) major depressive disorder, single episode, severe without psychotic features; and (2) generalized anxiety disorder. *Id*. He was assigned a Global Assessment of Functioning ("GAF") score of 40. (Tr. 355).[3]

On the same date, Plaintiff was seen by clinical nurse specialist (CNS) Maria Obias, who indicated that Plaintiff was making "some progress" toward his treatment objectives. (Tr. 358). Plaintiff also reported trying "to be functional by caring for self and helping, somewhat, grandmother with house works [sic]." *Id*. No suicidal/homicidal ideation or paranoia was reported. *Id*.

On May 1, 2013, Plaintiff reported to Dr. Harwell that he was feeling depressed and crying frequently. (Tr. 319). She noted that his speech was clear but tearful. *Id*. On November 27, 2013, Plaintiff was again seen by Dr. Harwell. (Tr. 403). His depression and anxiety were stable, and he was continued on the same medications. *Id*.

On October 31, 2013, Plaintiff complained of depression, anxiety, and psychosis—noting frustration with his low income and physical medical issues. (Tr. 399). Ms. Obias noted that Plaintiff did not take his psychiatric medication consistently, "which might have been the reason

---

3 The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood. A person who scores in this range may have illogical or irrelevant speech, and may avoid friends, neglect family, and be unable to work. *See* DSM IV at 34. An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

for symptoms not fully relieved." *Id.*

On November 27, 2013, Plaintiff was seen by Ms. Obias for "evaluation and treatment of depression, anxiety, psychosis pt. has auditory hallucinations, depression and anxiety." (Tr. 401) She noted he should continue counseling for stress management, and encouraged him to continue his sobriety. (Tr. 402).

On February 21, 2014, Plaintiff reported to Ms. Obias that he had no issues, and that he had been sleeping much better since receiving medication for restless leg syndrome. (Tr. 452). She noted that Plaintiff was making "significant progress" toward his treatment objectives. (Tr. 453). She continued to diagnose major depressive disorder, severe, without psychotic features, but noted that Plaintiff was "stable and functional." *Id.*

On February 28, 2014, Plaintiff returned to the ER claiming to have had a panic attack after a verbal altercation. (Tr. 433). He had been drinking beer and liquor. *Id.* Plaintiff was "[n]egative for suicidal ideas, hallucinations, behavioral problems, confusion, self-injury, dysphoric mood, decreased concentration and agitation. The patient is nervous/anxious. The patient is not hyperactive." (Tr. 434). On examination, "[h]e has a normal mood and affect. His behavior is normal. Judgment and thought content normal." *Id.*

On March 27, 2014, Plaintiff reported to Ms. Obias that his panic attack the prior month was related to him learning about a recurrence of his grandmother's breast cancer. (Tr. 455). He reported that he had been fine since his trip to the ER. *Id.* He denied using alcohol. *Id.* Ms. Obias continued to note that Plaintiff was making "significant progress" toward his treatment objectives. (Tr. 456).

On May 7, 2014, Plaintiff reported to Ms. Obias his symptoms were worse, as he had run out of medication two to three weeks earlier after he failed to attend his previous appointment.

(Tr. 458).

On July 9, 2014, Plaintiff went to the ER with complaints of an anxiety attack and chest pain. (Tr. 491). The clinical picture was most consistent with an anxiety attack, and Plaintiff was discharged in stable condition. (Tr. 492). In a later treatment note, Plaintiff admitted to having been off his medications at the time of the ER visit. (Tr. 461).

### 2. Medical and Non-Medical Opinions Concerning Plaintiff's Functional Limitations

#### a. Opinions Concerning Physical Limitations

On May 16, 2013, Dorothy A. Bradford, M.D., examined Plaintiff at the request of the state agency and Plaintiff underwent manual muscle testing. (Tr. 333-340). Dr. Bradford measured normal strength in all of Plaintiff's upper and lower extremities, except for his left hip ("fair") and knee ("good"). (Tr. 333). Plaintiff had normal use of both hands for grasping, pinching, manipulation, and fine coordination. *Id*. He had no difficulty picking up a coin or key, writing, holding a cup, opening a jar, buttoning/unbuttoning, using a zipper, or opening a door. (Tr. 334). There was no muscle atrophy. *Id*. Dr. Bradford found normal range of motion in Plaintiff's cervical spine, shoulders, elbows, wrists, hands, right leg, and left ankle, but significantly reduced range of motion in his left hip and knee. (Tr. 334-336). Dr. Bradford observed muscle spasm in Plaintiff's left thigh and gluteal muscle during active range of motion testing of the left hip. (Tr. 334, 340). Plaintiff was unable to do range of motion testing in his dorsolumbar spine due to an inability to balance. (Tr. 335, 339). He told Dr. Bradford that he could stand for no more than ten minutes, and used a cane "at all times." (Tr. 337). He also stated that his left leg goes to sleep after prolonged sitting, and he experiences low back and left hip pain. *Id*. With respect to gait/station, musculoskeletal examination of Plaintiff revealed "NON-WEIGHT BEARING ON THE LEFT, ANTALGIC GAIT FAVORING THE RIGHT. Station, posture

normal. Romberg negative. USES CANE ON RIGHT, Cannot stand without his cane." (Tr. 339).

Dr. Bradford concluded that Plaintiff had "severe peripheral vascular and venous disease and is

unable to perform active or sedentary activity but should improve." (Tr. 340).

On November 4, 2013, Plaintiff was seen by Eulogio Sioson, M.D., in connection with his

disability application. (Tr. 393-397). Plaintiff reported, "[h]e has back pain, right hip and leg

pains after walking 1/4 of a block, going up and down a flight of stairs, standing 5 minutes. He

has no problem sitting but has to elevate his legs. He does not drive but could ride a bus. He does

not do household chores except light cleaning, microwave cooking—lives with parents who do

them. He is able to dress, groom, shower, button, tie and grasp—gets hand tremors that he

related to anxiety. He could lift and carry a gallon of milk. He rated his pains 7/10—OTC pain

medications brings down the pain to 4/10." (Tr. 393). On physical examination, Plaintiff walked

normally with no assistive device, "did not mention that he has been using a cane," and did not

bring a cane with him. (Tr. 393). He did lose balance trying to do heel/toe walking. *Id*. He rose

from a 1/4 squat with right hip pains, and he was able to get up and down the examination table.

*Id*. Plaintiff had +1 edema with moderate ankle swelling on the right. (Tr. 394). He reported pain

on range of motion of the right hip. *Id*. He had no issues grasping or manipulating with his

hands. *Id*. Plaintiff had "no rigidity with mild action hand tremors. He had no sensory deficit. He

had no muscle atrophy. Manual muscle testing was normal. Biceps and knee reflexes were intact

and equal; other DTRs were difficult to elicit." *Id*. Dr. Sioson opined that Plaintiff would be

limited to light or sedentary work. *Id*.

On November 7, 2013, State Agency medical consultant Malika Haque, M.D. reviewed

Plaintiff's medical records and determined that Plaintiff, in an 8-hour workday, could lift/carry

10 pounds frequently and 20 pounds occasionally, stand/walk for 6 hours, sit for six hours, but

was limited in his ability to push/pull with the lower extremities. (Tr. 109). She further opined that Plaintiff could occasionally climb ramps/stairs, balance, stoop, crouch, and crawl. (Tr. 109-110). Plaintiff could frequently kneel, but never climb ladders/ropes/scaffolds. *Id*. Plaintiff had no visual, manipulative, or communicative limitations. (Tr. 110). Due to peripheral vascular disease ("PVD"), Dr. Haque also found that Plaintiff must avoid concentrated exposure to temperature extremes, vibration, and hazards. *Id*. Conversely, he had no limitations with respect to wetness, humidity, noise, or fumes, odors, and gases. *Id*.

On February 11, 2015, Dr. Harwell completed a checklist Medical Source Statement concerning Plaintiff's physical capacity. (Tr. 487-488). She opined that Plaintiff could frequently lift/carry less than five pounds and occasionally lift/carry one to five pounds. (Tr. 487). She further opined that he could stand/walk for one hour total and one-hour at a time; sit for two to three hours total and one to two hours without interruption; and rarely climb, balance, stoop, crouch, kneel, or crawl. *Id*. For each of these limitations, she wrote "restless leg syndrome" and "leg edema" in the corresponding box as the "medical findings" that support the assessment. *Id*. She also indicated that restless leg syndrome and leg edema limited Plaintiff to only occasional reaching, pushing/pulling, fine and gross manipulation. (Tr. 488). For the same reasons, Dr. Harwell opined that Plaintiff impairments affected his ability to work near moving machinery or be exposed to heights, temperature extremes, and pulmonary irritants. *Id*. She indicated that Plaintiff had been prescribed a cane, and needed a sit/stand option. *Id*. She rated Plaintiff's pain as "severe," indicating that it would interfere with Plaintiff's concentration and cause him to be off task as well as cause absenteeism. *Id*. She further opined that Plaintiff needed to elevate his legs 90 degrees at will, and that he would need an additional one hour of rest during a workday. *Id*.

### b. Opinions Concerning Mental Limitations

Clinical psychologist Michael Faust, Ph.D., examined Plaintiff at the request of the state agency in May 2013. (Tr. 341-349). Plaintiff believed he was disabled due to an inability to stand for long, shaking, and increased forgetfulness. (Tr. 342). Plaintiff stated that he was hospitalized at University Hospitals for one day in January of 2013, due to an anxiety attack that caused him to black out, indicating that the "same thing" happened in February of 2013 resulting in a four-day hospitalization. (Tr. 343). Plaintiff also reported that he had never been hospitalized for psychiatric reasons, that he was waiting to meet with a counselor, and that he was taking Celexa, as prescribed. (Tr. 344). He reported experiencing symptoms of depression for the past three to four years, and panic attacks for the past six months. *Id*. Dr. Faust observed that Plaintiff had no difficulty maintaining focus and attention during conversation, but struggled to stay focused during mental status tasks. (Tr. 345). "Thinking appeared logical and linear[,] [h]e did not display looseness of associations[,] [and] [t]here's no evidence of speech or language disorders." *Id*. He had no hallucinations, delusions, or paranoia, he was oriented x 4, his memory was good, his intelligence average, but he was unable to complete serial sevens but was able to recall three of three words after five minutes. (Tr. 346). Dr. Faust diagnosed adjustment disorder with mixed anxiety and depressed mood, panic disorder without agoraphobia, alcohol abuse, and assigned a GAF score of 55, indicative of moderate symptoms. (Tr. 346-347). Dr. Faust opined that Plaintiff had no difficulty understanding questions or instructions (including complex or multi-step instructions), mild impairment in sustained concentration, some limitations in his ability to respond to others in the work place due to adjustment disorder and panic disorder, and that exposure to work pressures may increase his depression and anxiety symptoms. (Tr. 347-348).

On September 10, 2013, social worker Steven Wooderd filled out a daily activities questionnaire. (Tr. 380-381). He indicated that Plaintiff "got along just fine" with employers, co-workers, and supervisors before he began feeling depressed in January of 2013. (Tr. 380). He stated that Plaintiff had "poor stress tolerance," was highly irritable, and preferred to be alone. *Id*. Mr. Wooderd indicated that "most of the time client does well successfully preparing meals," but sometimes burns his food if he forgets he is cooking. (Tr. 381). He also indicated that Plaintiff was effective at cleaning and maintaining his household chores, maintaining his daily hygiene, and independently using public transportation. *Id*. Mr. Wooderd opined that Plaintiff sometimes needed help shopping, and required assistance paying his bills. *Id*.

On January 31, 2014, nurse Obias completed a check-the-box medical source statement concerning Plaintiff's mental capacity. (Tr. 428-429). She checked boxes indicating that Plaintiff could rarely do the following: use judgment; maintain attention and concentration for two hour segments; deal with the public; relate to coworkers; interact with supervisors; function independently without supervision; work in coordination with or near others; deal with work stress; complete a normal workday without interruption from psychological symptoms; understand, remember and carry out complex or detailed job instructions; socialize; behave in an emotionally stable manner; relate predictably in social situations; manage funds; or leave home alone. (Tr. 428-429). She opined that Plaintiff could occasionally do the following: follow work rules; respond appropriately to changes in routine settings; maintain regular attendance, and understand, remember and carry out simple job instructions. *Id*. The only task that nurse Obias opined Plaintiff could do frequently was maintain his appearance. (Tr. 429). Her only explanation for the limitations assessed was Plaintiff's diagnosis of major depressive disorder, severe, with psychotic features. *Id*.

On February 13, 2015, nurse Obias completed a second medical source statement reiterating the same opinions that she did in January 2014. (Tr. 489-490.)

## C. Relevant Hearing Testimony

At the March 9, 2015 hearing, Plaintiff testified as follows:

- He finished the 10th grade, and last worked three years ago. At Red Lobster restaurant, he worked as a kitchen supervisor. (Tr. 33). He stopped working there due to his varicose veins, as he could not sit or stand for long. (Tr. 33-34). He also worked as a prep cook. (Tr. 36).

- He had surgery on his varicose veins. Prior to the surgery, he was hospitalized with a panic attack. It took him six to seven months to get his anxiety under control. (Tr. 34). He used to have them twice a day, now he has them off and on. *Id.*

- He sees nurse Obias twice a month—once just for medication and the other to check-in. (Tr. 36).

- He sees a case manager named Steven Woodard at Children and Family Services twice a week. (Tr. 36).

- He applied for disability because it was hard for him to survive and to find a job that does not require him to deal with people. (Tr. 37). He believes he may have been depressed for much of his life. He is frustrated with not being able to provide for his family or find a job that pays decent money. (Tr. 38-39).

- He was prescribed a cane two years earlier. (Tr. 40). He uses it all the time unless he is only walking a few feet. He always takes his cane with him when he leaves home. He can walk for 20 to 30 minutes with his cane. (Tr. 41). He can only sit for 30 to 45 minutes before he needs to get up or his legs fall asleep. He can stand for 10 to 20 minutes, but rarely does so because "it hurts even worse." (Tr. 42).

- His pain is sometimes sharp, but "[i]t's more of less feeling like I don't have any legs up under me. If that makes sense to you. So, it's like a pain, it's a pain, but it's more of a numbness." He has fallen, but does not do so frequently as he has learned to "work with it." (Tr. 43).

- He does not get into arguments frequently with family members. (Tr. 45).

- He last consumed alcohol 9 to 12 months earlier. (Tr. 46).

- He no longer has any hobbies, and has gained considerable weight. (Tr. 47).

The VE classified Plaintiff's past relevant work as a kitchen supervisor, Dictionary of Occupational Titles ("DICOT") 319.137-030, medium, skilled, with an SVP of 7, and preparation cook, DICOT 317.687-010, medium, unskilled, with an SVP of 2. (Tr. 51).

The ALJ posed the following hypothetical question to the VE:

> Assume an individual who can engage in light exertion defined as lifting up to zero to 10 pounds frequently and zero to 20 pounds occasionally. Who can occasionally use foot controls bi-laterally. Posturals are all occasional. Except for never climb ladders, ropes, or scaffolds. Should avoid concentrated exposure to extreme cold, heat, or vibration. And all hazards. Mental is limited to simple, routine, type work with few changes. Can interact frequently with the general public, co-workers, and supervisors, but in a superficial way. Defined as speaking, signaling, to take instructions, carry out instructions, ask questions, and serve. But no mentoring, collaboration, or persuading.

(Tr. 51-52).

The VE testified that such an individual would be unable to perform Plaintiff's past relevant work, but identified the following as examples of jobs that such an individual could perform: cashier II, DICOT 211.462-010, light, unskilled, with an SVP of 2 (6,000 jobs locally, 25,000 in Ohio, 800,000 nationally); cafeteria attendant, DICOT 311.677-010, light, unskilled, with an SVP of 2 (2,700 jobs locally, 8,000 in Ohio, 280,000 nationally); assembler, plastic hospital Products, DICOT 712.687-010, light, unskilled, with an SVP of 2 (1,400 jobs locally, 5,000 in Ohio, 100,000 nationally). (Tr. 52-53). In response to questions posed by the ALJ, the VE testified that an individual could be off task 10 percent of the day without it impacting the jobs identified, but that an individual who was off task 20 percent of the time would be unemployable especially at the unskilled level. (Tr. 53-54).

Plaintiff's counsel also posed a hypothetical question to the VE containing the following restrictions:

> [A]ssume a hypothetical worker the claimant's age, education, and work history,

limited to sedentary, unskilled employment with the following additional restrictions. They can only rarely, meaning 10 percent or less; climb, balance, stoop, crouch, kneel, crawl. There could be -- the hypothetical work could not work at heights. Could not be around moving machinery or utilize moving machinery. They would require use of a cane. When seated, their legs would have to be elevated at a 90-degree angle and they would require …a sit/stand option.

(Tr. 54-55).

The VE testified that such an individual would not be able to perform any job in the local or national economy, especially at the unskilled level. (Tr. 55). Plaintiff's counsel posed a second hypothetical question asking the VE to assume an individual "limited to sedentary, unskilled employment, who [would] miss work all together two days per month on a regular basis." (Tr. 55). The VE again testified that such an individual would not be able to maintain employment, especially at the unskilled level. (Tr. 55).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and

416.920(b). Second, the claimant must show that he suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent him from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent him from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since December 31, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: venous insufficiency (PVD), osteoarthritis, adjustment disorder with mixed anxiety and depression, and panic disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except the claimant can only occasionally operate foot controls (bilaterally). The claimant can never climb ladders, ropes, or scaffolds, and can only occasionally climb ramps or stairs. He is also limited to occasional balancing, stooping, kneeling, crouching, and crawling. The claimant must avoid concentrated exposure to extreme heat, cold, and vibration. He must avoid all hazards. The claimant is limited to simple, routine work with few changes. He can interact frequently with the public, coworkers, and supervisors, but in a superficial way. "Superficial" is defined as speaking, signaling, taking and carrying out instructions, asking questions, and seeing; but no mentoring, collaborating, or persuading.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 22, 1973 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset elate (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate In English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Pa11404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-22).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

## B. Plaintiff's Assignments of Error

### 1. The Weight Ascribed to the Opinions of a Treating Physician[4]

In the first assignment of error, Plaintiff asserts that the ALJ erred by not affording significant weight to the opinions of his treating physician, Dr. Harwell, as set forth in a February 2015 questionnaire. (R. 13, PageID# 587-592). Conversely, the Commissioner avers that the ALJ reasonably weighed the opinion evidence from Dr. Harwell, and identified inconsistencies between her opinions and the evidence of record. (R. 16, PageID# 617-620). The Commissioner does not challenge that Dr. Harwell was a treating source, but does note that she had not seen Plaintiff for more than a year at the time the February 2015 questionnaire was completed. *Id*.

"Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions

---

[4] New regulations effective March 27, 2017, 20 C.F.R. §§ 404.1527 & 416.927 set forth the rules for evaluating opinion evidence, both medical and nonmedical, for claims filed *before* that date. Conversely, 20 C.F.R. §§ 404.1520c & 416.920c set forth the rules for evaluating such evidence for claims filed *on or after* March 27, 2017. The latter regulations, not applicable to the present case, eliminate the term "treating source," as well as what is customarily known as the "treating source rule." *See also Revisions to Rules Regarding the Evaluation of Medical Evidence*, 81 FR 62560 at 62573-62574 (Sept. 9, 2016) ("we would no longer give a specific weight to medical opinions … this includes giving controlling weight to medical opinions from treating sources … [and] [w]e would not defer or give any specific evidentiary weight, including controlling weight, to any … medical opinion, including from an individual's own healthcare providers.") It bears noting that the current iterations of §§ 404.1527 & 416.927, while purporting to apply to claims filed *before* March 27, 2017, are not identical in language to the version in effect at the time of the ALJ's decision. For the sake of consistency, the court continues to cite the language from the former regulation sections that were in effect at the time of the ALJ's decision. Furthermore, while the current language of the regulations has been modified and renumbered, the changes, on their face, do not appear to be substantive and would not alter this court's recommendation. As noted by the Social Security Administration (SSA), for cases filed before March 27, 2017, it "will continue to apply [its] current rules for evaluating evidence from a treating source …." *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844 at 5861 (Jan. 18, 2017). Thus, the SSA also does not perceive its changes to be substantive.

are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)).   In other words, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ does not give a treating source's opinion controlling weight, then the ALJ must give good reasons for doing so that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See Wilson*, 378 F.3d at 544 (*quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188*, at *5). The "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)); *see also Johnson v. Comm'r of Soc. Sec.*, 193 F. Supp. 3d 836, 846 (N.D. Ohio 2016) ("The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.") (Polster, J.)

It is well-established that administrative law judges may not make medical judgments. *See Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (*quoting Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir.

1990)). Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009). If fully explained with appropriate citations to the record, a good reason for discounting a treating physician's opinion is a finding that it is "unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence." *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6th Cir. 2016) (*citing Morr v. Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6th Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6th Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

The ALJ addressed Dr. Harwell's opinions as follows:

> In February 2015, treating physician Dr. Harwell opined that the claimant could not walk more than one hour or sit more than three hours in an eight-hour workday due to leg edema and restless leg syndrome (Exhibit 21F). She also limited the claimant in the use of hands to occasional reaching, fine manipulation and gross manipulation. The undersigned did not afford significant weight to this statement because Dr. Harwell's opinion is inconsistent with her treatment records, which do not demonstrate such severe limitations in the claimant's capacity for standing and walking. Dr. Harwell also reported prescribing a cane for the claimant; however, as discussed above, several medical sources observed intact, unassisted gait in the claimant. Moreover, diagnoses of leg edema and restless leg syndrome do not support limiting the claimant's use of his hands to occasional reaching, fine manipulation and gross manipulation as she had limited. As a result, it appears that the limitation in the use of hands is not objective but likely based on her attempt to help the claimant obtain disability benefits. This reduces the weight and persuasiveness of her opinion.

(Tr. 20).

First, Plaintiff's assertion that the ALJ erred by failing to state the weight she was assigning to Dr. Harwell's opinion is not supportable. (R. 13, PageID# 590). The ALJ plainly rejected the

extensive lifting/carrying, standing/walking, sitting, and manipulative restrictions assessed by

Dr. Harwell. She made this clear by not ascribing the opinion any significant weight and by not

incorporating these limitations in the RFC. Plaintiff cites no law suggesting that there are

standardized terms that must be used when assessing a treating source's opinion. *Id.*

Second, the ALJ found that Dr. Harwell's opinion was inconsistent with both her treatment

records, as they did not document such severe limitations in Plaintiff's ability to stand/walk, as

well as with other medical evidence of record that shows an unassisted, intact gait. (Tr. 20).

Consistency is one of the factors used by an ALJ when evaluating the weight ascribed to an

opinion, and "[g]enerally, the more consistent an opinion is with the record as a whole, the more

weight we will give to that opinion." 20 C.F.R. §§ 404.1527(c)(4) & 416.927(c)(4). Earlier in the

decision, the ALJ specifically identified Dr. Harwell's treatment note from May of 2013,

indicating that Plaintiff had a steady gait. (Tr. 17, 407). The decision also pointed to the dearth of

evidence supporting clinical signs of a joint disorder in the upper or lower extremities (Tr. 19),

normal coordination and gait at an ER visit in February (Tr. 18, 448), activities that are

inconsistent with an inability to perform prolonged standing such as using public transportation

(Tr. 18), and perhaps most notably that at a consultative examination Plaintiff walked normally

without a cane, did not mention use of a cane, and did not even bring a cane with him to the

examination. (Tr. 19, 393).

Finally, the ALJ rejected Dr. Harwell's opinion because she believed Dr. Harwell was

likely attempting to help Plaintiff obtain disability. (Tr. 20). Had the ALJ not explained her basis

for this conclusion, the court would be highly skeptical whether such a reason, on its own, would

satisfy the "good reasons" requirement of the treating physician rule. The ALJ's decision,

however, specifically pointed to Dr. Harwell's inclusion of unsubstantiated functional

limitations, namely Plaintiff's alleged inability to perform more than occasional reaching or occasional fine and gross manipulation. (Tr. 20, 488). The decision reasonably explained that Dr. Harwell's treatment notes do not contain any diagnoses that could reasonably cause the manipulative restrictions. *Id*. In fact, the February 2015 questionnaire identifies restless leg syndrome and leg edema as supporting limitations that involve only the upper extremities. In addition, none of Plaintiff's physical impairments found to be severe at Step Two involve the upper extremities, as his severe impairments were determined to be venous insufficiency in the legs and osteoarthritis of the lumbar spine and left hip. (Tr. 12-13). Plaintiff has not alleged the ALJ erred by failing to designate as severe any impairments involving the upper extremities. Tellingly, Plaintiff's brief fails to explain how Dr. Harwell's inclusion of manipulative limitations could be construed as anything but an accommodation to her patient.

The court finds it was not unreasonable for the ALJ to determine that neither restless leg syndrome nor leg edema have any rational relation to functional limitations involving the upper extremities. As such, the ALJ's concomitant determination —that Dr. Harwell's inclusion of manipulative limitations that have no justification anywhere in the record reflects an intent to help the Plaintiff obtain disability—is similarly reasonable. Under such circumstances, the ALJ could certainly call into question the validity of the entire opinion as influenced by bias in favor of a patient. In a decision from the District Court for Southern District of Ohio, the ALJ therein rejected the opinions of treating sources from a VA hospital, noting the stark contrast between the "very little prescribed treatment for orthopedic problems" and the sudden appearance of disabling levels of orthopedic problems in their functionality assessments. *See, e.g., Langenbahm v. Comm'r of Soc. Sec.*, No. 1:12cv651, 2013 WL 4517794 at **8–9 (S.D. Ohio Aug. 26, 2013) (finding the ALJ reasonably rejected the opinions of treating sources based on the ALJ's finding

that medical personnel may have been attempting to aid the claimant obtain disability); *see also Ruiz v. Colvin*, No. 14cv431, 2015 WL 1577981 at *7 (S.D. Ill. Apr. 2, 2015) ("The ALJ must be mindful that the treating doctor has the advantage of having spent more time with the plaintiff but, at the same time, he may 'bend over backwards' to help a patient obtain benefits.") (*citing Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)); *cf. Policoro v. Comm'r of Soc. Sec.*, No. 1:09cv71, 2010 WL 3779910 at *9 (W.D. Mich. Mar. 22, 2010), *report and recommendation adopted sub nom. Policoro v. Astrue,* 2010 WL 3779543 (W.D. Mich. Sept. 22, 2010) (finding no error where ALJ rejected a treating source's opinion as "unusually supportive" due to a number of opinions being offered on areas "outside his expertise," and explaining that "[t]he ALJ's observations were appropriate and well-supported" and not simply based on "speculation" regarding the treating source's motives").

Reading the decision as a whole, the ALJ sufficiently set forth good reasons for rejecting the opinion of Dr. Harwell. Plaintiff's first assignment of error, therefore, is without merit.[5]

## 2. **The Weight Ascribed to Other Sources**

In the second assignment of error, Plaintiff asserts that the ALJ erred by ascribing little

---

[5] Intermingled with Plaintiff's argument that the ALJ failed to accord proper weight to his treating doctor, Dr. Harwell, is an ambiguous and undeveloped challenge to the weight accorded to the opinions of non-treating sources, Drs. Sioson and Haque. (R. 13, PageID# 591-592). Plaintiff first complains that the ALJ did not accept the entirety of either opinion while at the same time stating that the ALJ "gave controlling weight to their opinions." *Id.* Next, Plaintiff contends that the ALJ accepted some portions of the opinion but not others. *Id.* The brief, however, does not identify which portions of their opinions were ostensibly rejected or the legal standards applicable to such non-treating source opinions. Moreover, the brief is bereft of any analysis of the explanation given by the ALJ as it relates to the opinions of Drs. Sioson and Haque. It does not describe why Plaintiff believes the ALJ's explanation was deficient other than to suggest, again without explanation, that the ALJ was cherry-picking. *Id.* "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) (internal citations omitted)). The court deems this argument waived, as it cannot take the generalized statements made by Plaintiff and construct a legal argument on his behalf.

weight to the opinions of nurse Obias and a social worker, Mr. Wooderd. (R. 13, PageID# 593-595).

Pursuant to the regulations in effect at the time the ALJ rendered her opinion on April 6, 2015, nurse practitioners are not included among the five identified types of "acceptable medical sources," but rather merely as "other sources." *Compare* former 20 C.F.R. §§ 404.1513(a) & 416.913(a) with former 20 C.F.R. §§ 404.1513(d)(1) & 416.913(d)(1). While recent revisions to the regulations now include licensed advanced practice registered nurses among the list of "acceptable medical sources," the revisions are expressly *not* retroactive. *See* 20 C.F.R. §§ 404.1502(a)(7) & 416.902(a)(7) ("Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice (**only with respect to claims filed (see § 416.325) on or *after* March 27, 2017**)(emphasis added)); *see also Walters v. Comm'r of Social Sec.*, 127 F.3d 525, 530 (6th Cir. 1997) (finding the ALJ has the discretion to determine the appropriate weight to accord the opinion an "other source" such as a chiropractor).

Although nurse practitioners are not "acceptable medical sources" under the regulations for the purposes of the case at bar, Social Security Ruling ("SSR") 06-03p, notes that information from "other sources" such as nurse practitioners "are important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939 at * 2-3 (Aug. 9, 2006). A recent decision from within this district explained the ALJ's duties in connection with opinions from "other sources" as follows:

> In evaluating the opinions from "other sources," an ALJ should consider various factors, "including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (citation omitted); *see* SSR 06–03P. The ruling's explanation of the consideration to be afforded

"other source" opinions provides:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, *the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinion may have an effect on the outcome of the case*. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the initial and reconsideration levels, if the determination is less than fully favorable.

SSR 06–03P, 2006 WL 2329939, at *6 (emphasis added).

Given this guidance, "it will rarely be enough for the commissioner to silently 'consider' the above-mentioned factors in deciding how much weight to give to an 'other source' who has seen the claimant in the source's professional capacity." *Estep v. Comm'r of Soc. Sec.*, Case No. 15cv10329, 2016 WL 1242360, at *3 (E.D. Mich. Mar. 30, 2016); *see Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014) ("An ALJ must consider other-source opinions and 'generally should explain the weight given to opinions for these 'other sources[.]'") (alteration in original) (quoting SSR 06–03P). Rather, "[t]he Sixth Circuit has repeatedly recognized that the commissioner must make an adequate record of the commissioner's consideration of an 'other source' who has seen the claimant in the source's professional capacity." *Estep*, 2016 WL 1242360, at *3 (collecting cases); *Hatfield v. Astrue*, No. 3:07–cv–242, 2008 WL 2437673, at *3 (E.D. Tenn. June 13, 2008) (noting that "[t]he Sixth Circuit...appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight [given to an 'other source' opinions], as opposed to leaving the decision whether to explain to the ALJ's discretion") (citing *Cruse*, 502 F.3d at 541). **Still, "[s]o long as the ALJ addresses the opinion [from an 'other source'] and gives reasons for crediting or not crediting the opinion, the ALJ has complied with the regulations."** *Drain v. Comm'r of Soc. Sec.*, No. 14cv12036, 2015 WL 4603038, at *4 (E.D. Mich. July 30, 2015) (citing *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011)).

*Hirko v. Colvin*, No. 1:15cv580, 2016 WL 4486852 at *3 (N.D. Ohio Aug. 26, 2016) (Lioi, J.)

(emphasis added).

Here the ALJ did not ignore nurse Obias's opinions or merely consider them in silence. Instead, the ALJ provided the following explanation concerning the weight accorded to her opinions:

> In January 2014 and February 2015, Maria Obias, a certified nurse specialist (CNS), completed medical source statements on the claimant's behalf; both consisted of checklists for the author to rate the claimant's capacity for performing a work-related mental activities (Exhibits 15F, 22F). Ms. Obias indicated that the claimant could rarely perform most of these activities, including dealing with stress and leaving his home on his own (*Id.*). Nurse specialists are not considered acceptable medical sources under the regulations and Ms. Obias's opinion is not consistent with the claimant's self-described daily activities, including independent self-care and using public transportation. Therefore, the undersigned did not afford significant weight to these opinions.

(Tr. 20-21).

The ALJ's discussion is sufficient, and she adequately considered those factors she deemed relevant, such as the consistency of the pertinent opinions with the record as a whole. The ALJ specifically notes that Ms. Obias's assessed limitations are inconsistent with Plaintiff's daily activities and abilities, some of which are discussed earlier in the decision. (Tr. 17-18). Further, reading the opinion as a whole, just two paragraphs earlier, the ALJ credited some of the opinions of Mr. Wooderd pertaining to Plaintiff's independence with self-care, household chores, and the ability to independently use public transportation, which the ALJ found to be inconsistent with the more extreme limitations assessed by nurse Obias. (Tr. 20). In his brief, Plaintiff suggests that nurse Obias's opinion was detailed, and therefore, required a detailed explanation as to why it was rejected. (R. 13, PageID# 593). This position, however, is not supported by any of the authority cited by Plaintiff and the suggestion that a heightened explanation is required contradicts the above cited authority. Because the explanation

requirement for considering "other source" opinions is not the equivalent of the treating physician rule, which is applicable only to *acceptable medical sources*, the court finds no deficiency with the level of explanation the ALJ provided regarding nurse Obias's opinion.

Plaintiff also challenges the ALJ's decision to ascribe little weight to the opinion of Mr. Wooderd, a social worker. Under the regulations, social workers not only fail to qualify as an "acceptable medical source," but are not considered "medical sources." 20 C.F.R. §§ 404.1513(a)-(d) & 416.913(a)-(d). Nevertheless, an ALJ should "generally should explain the weight given to opinions from these 'other sources.'" SSR 06-03p. Again, this explanation requirement should not be confused with the "good reasons" requirement applicable to acceptable medical sources who have treated a claimant in their professional capacity. *See, e.g., Miller v. Comm'r of Soc.* Sec., 811 F.3d 825, 838 (6th Cir. 2016) (observing that a "licensed clinical social worker" is not an "acceptable medical source," and, therefore, rejecting the contention that a social worker's opinion was owed deferential weight); *accord Racz v. Comm'r of Soc. Sec.*, No. 3:15-cv-74, 2016 WL 612536 at *10 (S.D. Ohio Feb. 16, 2016) (finding it was erroneous to categorize a social worker as a "treating source," as "licensed independent social workers are not 'acceptable medical sources'"); *see also Payne v. Comm'r of Soc. Sec.*, 402 Fed. App'x 109 (6th Cir. 2010) (finding the "ALJ did not err in failing to include any limitations noted by ... the case manager.... [as] social workers are not acceptable medical sources."); *accord Hayes v. Comm'r of Soc. Sec.*, No. 1:09-cv-1107, 2011 WL 2633945 at *6 (W.D. Mich. June 15, 2011) ("There is no 'treating social worker' rule. Social workers are not 'acceptable medical sources.' Their opinions are not treating-source opinions.") (internal citations omitted).

The ALJ complied with the articulation requirement and explained the weight she ascribed to Mr. Wooderd's opinion as follows:

In September 2013, Steven Wooderd, BSW, the claimant's caseworker, completed a Daily Activities Questionnaire on the claimant's behalf (Exhibit 8F). Mr. Wooderd reported that the claimant lived with his grandmother and that the claimant's depression and anger issues prevented him from living independently (Exhibit 8F/6). Mr. Wooderd also opined that the claimant had poor stress tolerance, was highly irritable, and preferred to be by himself (*Id.*). However, as discussed above, Mr. Wooderd also reported that the claimant was generally independent with self-care and household chores and could use public transportation (Exhibit 8F/7). Caseworkers are not acceptable medical sources and Mr. Wooderd's opinion that the claimant could not live independently is inconsistent with his description of the claimant's daily activities. Therefore, the undersigned afforded little weight to this opinion.

(Tr. 20).

The ALJ complied with the articulation requirement applicable to non-medical sources.

Plaintiff has not identified any error. To the extent he suggests a heightened or more detailed explanation was required, there is no authority to support such an argument.[6]

Plaintiff's second assignment of error is without merit.

## VI. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be AFFIRMED.

s/ *David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: June 1, 2017

---

[6] Plaintiff does suggest that his daily activities do not confirm his ability to work for 8-hours a day, five days a week. (R. 13, PageID# 594-595). The court agrees with the Commissioner that the significance of the daily activities identified by the ALJ are not that they conclusively establish Plaintiff's ability to work, but rather that they undermine the opinion of Mr. Wooderd, which suggests a greater level of restriction. (R. 16, PageID# 622-624).

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the district court's order.   *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).